IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SOUFIAN AMRI and MICHAEL QUEEN, | ) | 1:17-cr-50 (LMB) |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Defendants Soufian Amri ("Amri") and Michael Queen ("Queen") (collectively, "defendants") came before the Court for a criminal bench trial on a partially stipulated record, having executed a knowing and voluntary waiver of their right to a trial by jury. [Dkt. 53]. Although the defendants have stipulated to the factual record, which is quoted verbatim in this opinion, they reserved the right to raise numerous objections and to argue whether the stipulated facts were sufficient to support conviction. For the reasons that follow, all but one of the defendant's evidentiary objections will be denied, Amri will be found guilty of the charges in Counts 1, 2, and 4, Queen will be found guilty of the charges in Counts 1 and 5, both defendants will be acquitted of the charge in Count 3, and the sentencing enhancement element in Counts 4 and 5 will be applied because the government has proven it beyond a reasonable doubt.

## I. THE INDICTMENT

Count 1 charges that from June 24, 2016 until July 8, 2016, in Fairfax County, the defendants unlawfully and knowingly conspired (1) to corruptly persuade, and engage in misleading conduct toward, another person with the intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States; and (2) to willfully conceal a material fact, and to make a materially false statement in a matter involving international terrorism, all in violation of 18 U.S.C. § 371. [Dkt. 31] at 1–2. In furtherance of the conspiracy,

the indictment alleges that at least seven overt acts were committed, including that: (1) Amri told Queen that the Federal Bureau of Investigation ("FBI") was asking questions about whether they knew anyone who supported ISIS, or attempted to travel overseas to join ISIS; (2) Amri told Queen not to mention Haris Qamar ("Qamar"), a mutual friend of theirs; and (3) Amri and Queen both falsely told the FBI that the only person they knew who might support ISIS was a "tall, thin, Indian" man. Id. at 2–3.

Count 2 charges that on June 24, 2016, Amri knowingly and unlawfully attempted to corruptly persuade Queen to prevent the communication to a law enforcement officer of information relating to the possible commission of a federal offense by attempting to persuade Queen to refrain from disclosing to the FBI Qamar's support for ISIS and attempted overseas travel, in violation of 18 U.S.C. § 1512(b). Id. at 4.

Count 3 charges that on June 24, 2016, both defendants knowingly and unlawfully engaged in misleading conduct toward another person with the intent to prevent the communication to a law enforcement officer of the United States of information relating to the possible commission of a federal offense by telling the FBI that the only person they knew who might support ISIS was a "tall, thin, Indian" man when in fact they knew that Qamar had expressed support for ISIS and attempted to travel overseas to join ISIS, all in violation of 18 U.S.C. § 1512(b). Id. at 5.

Counts 4 and 5 respectively charge Amri and Queen with knowingly and willfully making material false statements to the FBI by telling agents that the only person they knew who might support ISIS was a "tall, thin, Indian" man for the purpose of concealing Qamar's support for ISIS, in violation of 18 U.S.C. § 1001(a). These counts further allege that these offenses "involved international terrorism" within the meaning of 18 U.S.C. § 2331.

## II. FINDINGS OF FACT

The parties have stipulated, and the Court finds, that the following facts are true and that the government could have proven them beyond a reasonable doubt at trial[1]:

1. Soufian Amri is a 31-year-old native-born United States citizen living in Falls Church, Virginia. Michael Queen is a 27-year-old native-born United States citizen living in Woodbridge, Virginia. Amri and Queen work in Fairfax, Virginia, at a gaming center business with high-speed internet access that they jointly own.

2. Haris Qamar is a United States citizen born in 1990, and who, until July 2016, resided in Burke, Virginia and was a frequent supporter of ISIS on the internet. In 2015 and 2016, Qamar used scores of variations of the handle "newerajihadi" (such as "newerajihadi21; newerajihadi22; newerajihadi23, etc.) to make posts on Twitter that were openly supportive of the Islamic State. As Twitter, Inc. closed older accounts, Qamar opened newer ones with higher numbers appended to the "newerajihadi" body.

3. This stipulation refers to a Confidential Witness ("CW"), who is a United States citizen and has provided information to the FBI since 2013. None of the information provided by CW has been shown to be unreliable. CW receives money from the FBI for services provided by CW.

4. CW met Qamar in September 2015. Between that time and Qamar's arrest in July 2016, they met in person on numerous occasions, and followed each other on social media. Except for their meetings on September 6, 2015, and September 11, 2015, all conversations between CW and Qamar are documented on recordings provided to the FBI by CW.

5. CW reported that, in addition to supporting ISIL on Twitter, Qamar regularly voiced support for ISIS to his friends, and expressed his love of violence. According to CW, Amri and Queen knew that Qamar watched ISIS videos at the gaming center they owned and operated.

6. On September 11, 2015, a "kill list" was posted to the internet by terrorists connected with ISIS, containing the names and addresses of members of the U.S. military. A few days later, Qamar told CW that the residences of several soldiers who appeared on that "kill list" were near Qamar's own home, and that Qamar had observed undercover police cars near those residences. On October 29, 2015, and again on May 12, 2016, Qamar reminded CW of the addresses on the kill list, and told CW the name of the street.

---

[1] The stipulations are reproduced as they were filed by the parties.

7. On September 16, 2015, from Twitter account with handle @newerajihadi20 [sic], Qamar tweeted his prayer that Allah "give strength to the mujahideen to slaughter every single US military officer."

8. On March 19, 2016, in response to a post by another Twitter user regarding damages done by airstrikes in the ISIL capital of Raqqa, Syria, the user of the Twitter account with the handle @newerajihadi79 posted "May Allah swt take revenge on kuffar and kill their families."

9. Two residences on the list are, in fact, within two miles of Qamar's residence. In light of Qamar's statement to CW that Qamar observed undercover police cars near those residences, the FBI suspected that Qamar likely drove past those residences after their occupants were included on the "kill list."

10. In a conversation recorded by CW on September 25, 2015, Qamar told CW that Qamar tried to join ISIS in 2014, but Qamar's parents prevented him from traveling overseas. Qamar said his parents threatened to notify law enforcement authorities. Qamar also said he fought with his father and called his father a traitor to Islam. In a conversation recorded on March 16, 2016, Qamar told CW that he bought a plane ticket and lost $700 because he could not travel without his passport.

11. In 2015 and 2016, SOUFIAN AMRI and MICHAEL QUEEN were friends with Qamar. Qamar spent a significant amount of time at the gaming center that AMRI and QUEEN operated. They knew that Qamar was a frequent supporter of ISIS on the internet, and they knew that he had planned to travel to join ISIS in 2014 and had purchased an airline ticket to do so.

12. On June 24, 2016, FBI agents interviewed AMRI at the business he shares with QUEEN, in part to learn additional information about Qamar, including but not limited to his attempted travel to join ISIS, and in part about a pro-ISIS Facebook post made by QUEEN. The FBI agents told AMRI that lying to the FBI is a federal offense. Amri was asked if he knew anyone who voiced support for ISIS. He stated "particularly, not really . . . that comes here no." AMRI also said that he knew one person who-long ago-mentioned traveling for the purpose of joining ISIS. AMRI described that individual as a tall, thin, Indian kid, whom AMRI had not seen for a long time.

13. Later that day, FBI agents observed AMRI talking to QUEEN at their business, and then interviewed QUEEN. The FBI agents explained to QUEEN that lying to the FBI is a federal offense. QUEEN said that he did not know of anyone who voiced support for ISIS or posted pro-ISIS materials online. QUEEN identified the tall Indian individual referenced by AMRI as "Sunite," but said that he did not know if Sunite was serious about supporting ISIS. QUEEN also said that he did not know of anybody who tried to travel overseas for the purpose of joining ISIS.

14. On June 28, 2016, a confidential witness ("CW") recorded a conversation between QUEEN, Qamar, and the CW. In that conversation, QUEEN told Qamar and the CW about the FBI interviews on June 24, 2016. QUEEN said the FBI asked if QUEEN and AMRI knew anyone who was going to join ISIS, or otherwise was pro-ISIS. QUEEN told them he said to the FBI, "I don't know, we threw some . . . Hindu dude that we used to know underneath the bus." QUEEN said, "I'm never going to throw a Muslim underneath the bus to try to do the right thing."

15. Later that day, in another conversation recorded by the CW, Qamar told the CW that, after the FBI interviews, QUEEN told Qamar to be careful because the FBI was asking about anyone who supported ISIS. Qamar told the CW that QUEEN said when he (QUEEN) first heard about the FBI agents at his business, QUEEN immediately thought the FBI was there about Qamar.

16. On July 1, 2016, in another conversation recorded by the CW, AMRI told the CW that he told the FBI on June 24 that he had previously supported ISIS. When the CW asked why, AMRI responded, "[B]ecause with those guys you have to play along with them, you give them a glimpse of honesty, then you shut it. . . . After that I told them now I don't support them."

17. On July 8, 2016, Qamar was arrested and charged with attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, in part on the basis of Qamar's attempts to send money to ISIS, as well as videos of local landmarks for use in an ISIS publication to encourage lone-wolf attacks in the United States. Unbeknownst to Qamar, the account to which he was attempting to send the money and the videos was controlled by an FBI agent.

18. On July 8, 2016, shortly after Qamar's arrest, FBI agents spoke to AMRI again in another recorded conversation. Amri said he has known Qamar since 2009. Amri said that Qamar was obsessed with ISIS and constantly talked about ISIS. AMRI said that he knew that Qamar and the CW supported ISIS, but he failed to mention them to the FBI agents on June 24, 2016, because he did not want Qamar and the CW to be questioned by the FBI.

19. In the same interview, AMRI admitted that Qamar told him in 2014 about Qamar's plan to travel to Turkey for the purpose of joining ISIS. AMRI said Qamar ended up not going after Qamar's father took away Qamar's expired passport so that Qamar could not get a new passport. AMRI said that he gave Qamar $50 for basic necessities after Qamar was unable to get a refund for his $700 airline ticket to Turkey.

20. Also in AMRI's conversation with the FBI agents on July 8, 2016, he stated that after he was interviewed by the FBI on June 24, 2016, AMRI talked with QUEEN. AMRI admitted that he told QUEEN not to mention Qamar to the FBI.

21. In the same interview with the FBI on July 8, 2016, AMRI said that after he was interviewed by the FBI on June 24, 2016, AMRI told Qamar about the interview. AMRI told Qamar not to worry because AMRI and QUEEN did not mention Qamar to the FBI.

22. On July 8, 2016, the FBI also spoke to QUEEN again, shortly after Qamar's arrest. QUEEN initially reiterated that Sunite was the only person he knew who supported ISIS, and repeated that he was unaware of anyone who had tried to travel for the purpose of joining ISIS. Although QUEEN admitted to being friends with Qamar, he denied knowledge that the Twitter accounts used by Qamar were actually controlled by Qamar; denied knowing that Qamar supported ISIS; and denied knowledge that Qamar ever attempted to travel for the purpose of joining ISIS.

[Dkt. 56]; [Dkt. 58].

Additionally, Amri and the government have stipulated, and the Court finds, that the following facts are true and could have been proven beyond a reasonable doubt at trial:

23. During his two interviews with the FBI, AMRI indicated the following: He was against ISIS, and had been for years. He indicated that members of that organization were "crazy lunatics." He indicated that anyone who would try to join them was "stupid." He prohibited people who used the computers in his business from looking at ISIS related materials, and would "ban" them if they were caught violating the policy. He did not believe that any of his friends, including Qamar, were dangerous, as he believed their statements to be bluster. He loves the United States and the rights it provides its residents.

24. After AMRI learned about Qamar's trip to join ISIS in 2014, AMRI became very upset with him, told Qamar that he was an "idiot" for wanting to go, and demanded that Qamar apologize to his parents. AMRI said he (AMRI) "sparked the conflict" with Qamar's parents that ultimately resulted in Qamar not going to join ISIS. AMRI would scold Qamar when Qamar referred to ISIS positively. Subsequent to learning about the 2014 trip, AMRI told Qamar he needed to focus on school, and get his "civil engineering degree" so that he could "help people in the right way." Qamar had previously indicated to AMRI an interest in "building water and irrigation in Pakistan" which is lacking in adequate amounts of those facilities, and AMRI looked online at possible courses and encouraged Qamar to take the appropriate courses, including waste management courses. AMRI is hoping to start a granite business in the future, and would be willing to give Qamar a job in the business one day, in the hopes of redirecting Qamar towards more productive and appropriate endeavors. AMRI indicated that given the length of their friendship, he viewed Qamar as family, as a "brother," and felt a duty to try to

6

help him, and AMRI did not want to be perceived as having betrayed Qamar and his family, which he believed would happen if he reported Qamar's behavior to the authorities. AMRI was unaware of the facts contained in paragraphs 2-9 of this document, except to the extent that AMRI was aware that Qamar generally "was a frequent supporter of ISIS on the internet," and indicated he was unaware that Qamar had attempted to do anything illegal, and did not believe Qamar was capable of breaking the law.

25. AMRI has two years of college education in which he majored in economics. AMRI and QUEEN opened a new computer gaming business in 2015 on Braddock Road in Fairfax, Virginia with high speed internet, where they were responsible for hiring and working with an architect, a broker, construction personnel, going through a zoning process, marketing, hiring IT personnel, and other complex processes. AMRI and QUEEN continue to own and operate that business, which is how they spend their work days. AMRI and QUEEN's July 8, 2016 interviews took place in their respective homes. During the interviews, there were no physical constraints on their movement, no physical discomfort during the interviews, they were free to leave at any time, and there was no other form of physical intimidation or physical mistreatment during the interviews. AMRI and QUEEN were also advised, before they began speaking with the FBI, that making false statements to the FBI agents was illegal.

[Dkt. 56].

Additionally, Queen and the government have stipulated, and the Court finds, that the

following facts are true and could have been proven beyond a reasonable doubt at trial[2]:

26. After the FBI agents told QUEEN that Qamar had been arrested, QUEEN admitted that he spoke to AMRI on June 24, 2016, about what to tell the FBI about Qamar. When asked whether anyone told or coached him not to mention Qamar to the FBI, QUEEN said that AMRI told him to "be careful with what you say about [Qamar], because he might be linked to ISIS . . . and they might label me as the same." QUEEN also admitted that he did not mention Qamar to the FBI agents on June 24, 2016, because he did not want the FBI's attention to be on Qamar. QUEEN further admitted that he knew that Qamar had wanted to travel to ISIS, but was stopped by his parents.

27. AMRI and QUEEN opened a new computer gaming business in 2015 on Braddock Road in Fairfax, Virginia with high speed internet, where they were responsible for hiring and working with an architect, a broker, construction personnel, going through a zoning process, marketing, hiring IT personnel, and

---

[2] In the original document, these facts were numbered 23 and 24. For ease of reference in this Memorandum Opinion, they have been renumbered so that all the facts are continuously numbered.

other complex processes. AMRI and QUEEN continue to own and operate that business, which is how they spend their work days. AMRI and QUEEN's July 8, 2016 interviews took place in their respective homes. During the interviews, there were no physical constraints on their movement, no physical discomfort during the interviews, they were free to leave at any time, and there was no other form of physical intimidation or physical mistreatment during the interviews. AMRI and QUEEN were also advised, before they began speaking with the FBI, that making false statements to the FBI agents was illegal.

[Dkt. 58].

## III. CONCLUSIONS OF LAW

### A. Burdens of Proof

With respect to guilt, the burden is on the government to prove the guilt of the defendants beyond a reasonable doubt. Brinegar v. United States, 338 U.S. 160, 174 (1949). Similarly, the government must prove "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).

For the evidentiary objections and Amri's Motion to Suppress, the burden is on the government to demonstrate the admissibility of the evidence, including the voluntariness of any incriminating statement given to law enforcement personnel, by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168–69 (1986); United States v. Giddins, 858 F.3d 870, 881 (4th Cir. 2017); United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009).

### B. Motion to Suppress

Amri has moved to suppress the statements he made to the FBI on July 8, 2016,[3] arguing that they were involuntary under the Fifth Amendment because the agents misleadingly promised him immunity and engaged in economic coercion to extract the statements.

---

[3] Amri does not challenge his June 24, 2016, interview, or any other statements to law enforcement personnel. Queen did not file a Motion to Suppress.

The parties have stipulated that the interview took place in Amri's home and that there were "no physical constraints on [his] movement, [there was] no physical discomfort during the interviews, [he] were free to leave at any time, and there was no other form of physical intimidation or physical mistreatment during the interview[]." Findings of Fact ("FOF") ¶ 25. Accordingly, it is clear that this was not a custodial interview; however, even in a non-custodial setting, the Fifth Amendment demands that a criminal defendant's statements to law enforcement be voluntary. See Dickerson v. United States, 530 U.S. 428, 434 (2000). "Coercive police activity is a necessary finding for" incriminating statements "to be considered involuntary." Giddins, 858 F.3d at 881. "[C]oercion can be mental as well as physical," id. (quoting Arizona v. Fulminate, 499 U.S. 279, 287 (1991) (alteration in original)), and two types of mental coercion are relevant here.

Although there is no general duty to inform a defendant about whether he is the subject of an investigation, if the defendant does inquire about the nature of the investigation, an agent's failure to respond can amount to coercion if the agent intends to mislead the subject. Id. at 883–84. To succeed "on such a claim, the '[d]efendant must . . . prove that the misinformation was material in his decision to speak with the [police],' and 'produce clear and convincing evidence that the [police] affirmatively mis[led] him as to the true nature of their investigation.'" Id. at 884 (quoting United States v. Serlin, 707 F.2d 953, 956 (7th Cir. 1983) (alterations in original)).

In addition, a defendant must not be subjected to undue "economic coercion" that forces "him to choose between surrendering his Fifth Amendment rights or incurring adverse economic consequences." Id. at 881, 883 (internal quotation omitted). In Giddins, for example, the police "threatened to indefinitely retain [the defendant's] car if he failed to sign the Miranda waiver and answer their questions." Id. at 882. Specifically, when the defendant repeatedly asked the

officer whether he would be getting his car back, the officer replied, "Before I release the car to you, I would like to know some answers . . . . I would like to know some answers before we release your car back to you." Id. at 877 (internal quotation marks omitted) (alteration in original). The court reasoned that this threat amounted to improper coercion because the defendant "relied on his car to get him to his job, and it was the means of maintaining his livelihood." Id. at 883.[4]

Even when coercion has been established, the inquiry is not over. Id. at 22–23 (citing United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc)) A statement procured by coercive activity is still admissible unless "the defendant's will has been overborne or his capacity for self-determination is critically impaired." Braxton, 112 F.3d at 781. This review must be conducted by considering "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Id. (internal quotations omitted).

For the limited purpose of supporting his Motion to Suppress, Amri has supplemented the stipulated factual record with a transcript of his July 8 FBI interview, [Dkt. 68-1], and an audio recording of this interview, both of which the Court has considered. Amri argues that three statements by the FBI agent conducting the interview constitute promises or threats that were sufficiently compelling that they resulted in his will being overborne. First, approximately 14 minutes into the interview, the FBI agent said

> [W]e don't want this to come back. I think we can avoid this right now. I don't want this to come and [a]ffect your business. I don't feel like we have to go, at this point, and seize all your computers and do anything like that. I think we can

---

[4] The potential reach of this rule is limited by the requirement that the assets that are the subject of the threat must be "realistically likely of attainment" by the defendant. Giddins, 858 F.3d at 882 (quoting Lefkowitz v. Cunningham, 431 U.S. 801, 807 (1977)).

get through this by just talking to you. Right. As long as we come out of this feeling like hey, he's honest with us. He's told us everything he knows about [Haris].

Id. at 14:12.

At the 29 minute mark, the agent said

What we kind[] of need to do is go back through some of the things that probably [FBI agents] Andrew and Nick asked you about [on June 24, 2016] and just kind of get the full story. So like I know you were talking to protect [Haris] and say hey we're not going to say anything because they're coming out to talk to us, obviously we're not gonna throw our friend under the bus. That's fine. You're not gonna get in trouble for that. Umm, but I need to step back to the interview and kind of go through that and have a straight-forward conversation about that.

Id. at 29:00. Finally, at approximately the 49 minute mark, the agent stated

Had this gone down any other way like we would have come in, like if we weren't able to have this conversation, we would come in we would seal the computers and you would be out of business for like 6 months while they try to deal with this stuff.

Id. at 48:58.

Amri argues that the second statement, or perhaps the first and second added together, amount to a promise of immunity. [Dkt. 65] at 3. Although under most circumstances the use of immunized testimony against a defendant violates due process, see United States v. North, 910 F.2d 843, 853–54 (D.C. Cir. 1990), the record quoted above demonstrates that Amri was not offered immunity for his testimony. The first FBI statement simply implies that it was in Amri's interest to be honest with the FBI. That is a true statement, and it is a far cry from an offer of immunity from prosecution. The second statement, that Amri was "not going to get in trouble" for protecting Qamar and agreeing with Queen not to say anything, is arguably misleading; however, the law permits "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion[.]" Giddins, 858 F.3d at 883 (quoting Illinois v. Perkins, 496 U.S. 292, 297 (1990)). This is not a situation where the defendant

11

"inquired about the nature of the investigation," triggering a duty not to mislead the defendant about his status in the investigation, see id. (internal quotation omitted); indeed, Amri never asked whether he was under investigation. Instead, this specific statement came buried in the middle of a lengthy discursion by the FBI agent, the overall message of which was that the agent was seeking a more fulsome picture about what Amri knew when he spoke to the FBI agents on June 24, 2016. [Dkt. 68-1] at 29:00. The agent's tone of voice does nothing to alter that picture. Taken in context, the statement is no more than an (inaccurate) "opinion[] concerning the criminality of [the defendant's] conduct and how it would be viewed by others" that does not establish coercion. See United States v. Hunter, 912 F. Supp. 2d 388, 401 (E.D. Va. 2012).

Amri further argues that the agents engaged in impermissible economic coercion by threatening to deprive him of the use of the computers at his business, and therefore to deprive him of his livelihood. With respect to the first statement, this argument fails. Although the agent made reference to seizing "all your computers," he did not explicitly link Amri's willingness to talk to the use of his computers, as the officer in Giddins did with the defendant's car. Moreover, the FBI agent did not specify for how long Amri would have been deprived of the use of those computers. Although the agent suggested that there might be an "effect" on the business, he did not say how substantial that effect would be or how long it would last. In Giddins, by contrast, the threat was indefinite—the officer threatened not to return the car until the defendant agreed to talk to him. Accordingly, this statement did not rise to the level of improper coercion.

The third statement, coming approximately 50 minutes into the interview, is much more problematic. The agent said that if he and Amri had not been "able to have this conversation," that the FBI would have had to "seal the computers" and that Amri would have been "out of

12

business for like 6 months while they tr[ied] to deal with this stuff." [Dkt. 68-1] at 48:58. In other words, the agent told Amri that if he refused to talk, he would be put "out of business" for six months. This statement explicitly links an economic consequence to Amri's agreement to answer the FBI's questions, and the threatened consequence strikes at the heart of Amri's livelihood, his computer business. Just as depriving someone of the means to transport himself to and from work was found to constitute coercion in Giddins, depriving a small business owner of the tools necessary for his trade for six months could be considered impermissible coercion.

Ultimately, the Court does not need to determine whether Amri's will was overborne by this statement because even if it had been, all the evidence upon which the government relies was obtained before the agent made the problematic statement. Compare FOF ¶ 18, with [Dkt. 68-1] at 29:00 et seq.; compare FOF ¶ 19, with [Dkt. 68-1] at 8:20, 18:23; compare FOF ¶ 20, with [Dkt. 68-1] at 38:18, 45:23. Accordingly, the Motion to Suppress has been granted only to the extent that the Court has not considered any statements made by Amri after the minute 48:58 of the July 8, 2016, FBI interview. Concretely, the only stipulation affected by this holding is FOF ¶ 21, which the Court did not find necessary to evaluate Amri's guilt.

### C. Other Evidentiary Objections

Queen and Amri object to the relevance of FOF ¶ 17, which discusses that on July 8, 2016, Qamar was arrested for attempting to provide material support to ISIS. The information in FOF ¶ 17 is highly relevant because it enables the government to establish the status of the investigation when the alleged false statements giving rise to the § 1001 allegations were made, a fact relevant to the materiality of these statements. Accordingly, these objections are overruled.

Both defendants also object to the statement in FOF ¶ 9 that "[i]n light of Qamar's statement to CW that Qamar observed undercover police cars near those residences, the FBI

suspected that Qamar likely drove past those residences after their occupants were included on the 'kill list'" as improper opinion. To the contrary, this is a classic example of a lay inference rationally based on the witness' perception and therefore it is admissible under Rule 701. Moreover, the statement is relevant because it explains why the FBI was so concerned about learning as much as possible about Qamar and any associates.

Amri objects to Queen's statement in FOF ¶ 14 that he and Amri "threw some . . . Hindu dude that we used to know under the bus," arguing that it was hearsay and should be disregarded. Although the government has argued that this is admissible as a co-conspirator statement under Rule 801(d)(2)(e), the Court finds that it is not hearsay because it is not offered for the truth of the matter asserted. Rather, Queen's statement is extremely relevant to both the conspiracy and obstruction counts because it closely resembles the story that Amri gave the FBI agents, indicating coordination between the two defendants. Considered solely for that purpose, it is immaterial whether the content of the statement was or was not true.

Amri also objects under the hearsay rule to Queen's instruction to Qamar in FOF ¶ 15 "to be careful because the FBI was asking about anyone who supported ISIS" and Queen's statement that he "immediately thought the FBI was there about Qamar." These statements are excluded from the definition of hearsay under Rule 801(d)(2)(e) because they were made by Queen, a co-conspirator, in furtherance of the conspiracy by warning Qamar to "be careful" due to the FBI asking about "anyone who supported ISIS." FOF ¶ 15. Because an object of the conspiracy was to conceal Qamar's support for ISIS from the FBI, Queen's warning to Qamar plainly furthers that objective. Queen also objects to these statements, but they are clearly admissible against him as a statement by a party opponent under Rule 801(d)(2)(a).

In response to other objections, the government has stipulated that it does not offer the statements of Queen in FOF ¶¶ 13 and 22 against Amri, or the statements of Amri in FOF ¶¶ 20 and 21 against Queen. [Dkts. 62, 63]. Additionally, the government has agreed that the evidence in FOF ¶¶ 2 through 10 may only be considered for purposes of determining the materiality of the defendants' statements. [Dkt. 55] ¶ 2; [Dkt. 57] ¶ 2.

### D. The Conspiracy Charge

To prove the defendants guilty of the conspiracy charged in Count 1, the government must prove beyond a reasonable doubt that each defendant intentionally entered into an agreement to commit one or more of the charged objects; that they knew the purpose of the agreement; and that during the life of the conspiracy at least one of the alleged members of the conspiracy performed at least one of the charged overt acts.

The government has met that burden as to both defendants. Amri admitted that, after his June 24 FBI interview, in which he told the FBI that the only person he knew who might support ISIS was a "tall, thin, Indian" man, he contacted Queen and asked him "not to mention Qamar to the FBI." FOF ¶ 18. Later that day, Queen told the CW, "we threw some . . . Hindu dude that we used to know underneath the bus," id. ¶ 14, describing the same individual whom Amri had identified to the FBI as an ISIS supporter, id. ¶ 12. The identical nature of these two stories reveals that Amri and Queen in fact formed an agreement to "conceal . . . a material fact . . . and to make materially false . . . statements[,]" which is the second object charged in the indictment.[5] [Dkt. 31] at 1–2.

---

[5] Amri argues that the first object is a logical impossibility, because Queen could not enter into an agreement to corruptly persuade himself. Even if that is true, the government only has to prove one object to carry its burden.

Amri disputes this inference, arguing that it is possible that he merely informed Queen what he said but did not explicitly form an agreement with Queen to tell the same story. That argument fails because the circumstantial evidence is more than enough to demonstrate that such an agreement was reached. Not only did Amri admit to speaking to Queen immediately after his June 24 interview, FOF ¶ 20, Queen's statement to the CW that "we threw some . . . Hindu dude we used to know under the bus," id. ¶ 13 (emphasis added), is strong circumstantial evidence of coordinated action. The similarity of these statements, in conjunction with their proximity to the conversation that Amri had with Queen just after his June 24 interview, reveals that the two were not just sharing information but in fact formed an agreement to protect their friend Qamar by providing false and misleading information to the FBI.

As for the mens rea requirement, Amri has admitted that when the FBI interviewed him "he knew that Qamar . . . supported ISIS, but he failed to mention [him] to the FBI agents on June 24, 2016, because he did not want Qamar and the CW to be questioned by the FBI." See FOF ¶ 18. Amri's admission that he was attempting to prevent the FBI from questioning Qamar (and the CW, whom he did not know was cooperating with the FBI) establishes that his purpose in forming the agreement was to conceal information from the FBI.

Amri has argued that he lacked the requisite intent because he honestly believed that Qamar was not a threat to the United States and therefore that he was not encouraging the concealment of information that would have been material to a federal offense. As an initial matter, it is not clear that a defendant must know that his false statement is material; ordinarily, materiality is an objective question of law that does not turn on the defendant's mental state. See United States v. Gaudin, 28 F.3d 943, 949–50 (9th Cir. 1994). Assuming such a defense exists, the facts of this case do not support it. On June 24, 2016, the FBI put Amri on clear notice that

they were investigating activities related to a terrorist organization. FOF ¶ 12. Even if Amri honestly believed that Qamar's conduct was not "dangerous," id. ¶ 23, his claim that he did not believe that the FBI was investigating a possible violation of criminal law is not credible.

Finally, the stipulated facts establish several of the overt acts, including that Amri told Queen "not to mention Qamar to the FBI so that the FBI would not investigate Qamar and learn about his support for ISIS, and his attempt to travel overseas for the purpose of joining ISIS," Indictment, [Dkt. 31] at 2; FOF ¶¶ 18, 19; and that Queen "falsely denied to FBI agents that Qamar supported ISIS and . . . that he knew that in 2014, Qamar had attempted to travel overseas for the purpose of joining ISIS," Indictment, [Dkt. 31] at 3; FOF ¶ 14.

The government has also met its burden as to Queen. Queen admitted to the FBI that "Amri told him to 'be careful with what you say about [Qamar], because he might be linked to ISIS . . . and they might label me as the same,'" FOF ¶ 26. Queen also admitted to the CW that he and Amri "threw some . . . Hindu dude that we used to know underneath the bus," and that he would "never . . . throw a Muslim underneath the bus." Id. ¶ 14. These facts reveal that Queen and Amri agreed to tell the FBI the false story that Queen eventually told the FBI when he discussed "Sunite." See id. ¶ 13. Just as with Amri, this constitutes evidence of an agreement to "conceal . . . a material fact . . . and to make materially false . . . statements[.]" Indictment, [Dkt. 31] at 1–2. Queen admitted that his purpose in joining this agreement was "because he did not want the FBI's attention to be on Qamar," which establishes the necessary scienter. FOF ¶ 26. And, as with Amri, multiple overt acts have been established, including that Queen "falsely told the FBI that a 'tall, thin, Indian guy' by the name of 'Sunit[e]' was the only person Queen knew who might support ISIS," Indictment, [Dkt. 31] at 2; FOF ¶¶ 13, 26; and that Amri told Queen "not to mention Qamar to the FBI so that the FBI would not investigate Qamar and learn about

his support for ISIS, and his attempt to travel overseas for the purpose of joining ISIS,"
Indictment, [Dkt. 31] at 2; FOF ¶ 26.

Queen argues that he is differently situated from Amri because, just three days before the June 24 interview, Queen himself made a pro-ISIS Facebook post. According to Queen, his motive in providing false information to the FBI was to avoid being linked to ISIS himself, not protecting Qamar. [Dkt. 74] at 2–3. This argument directly contradicts the stipulated facts, in which Queen admitted that he "immediately thought the FBI was there about Qamar," FOF ¶ 15, and that he "did not want the FBI's attention to be on Qamar," FOF ¶ 23. The possibility that Queen might have had multiple motives for providing misleading information does not diminish the significance of his admission that he also sought to deflect attention from Qamar.

For all these reasons, both defendants will be found guilty of Count 1, conspiracy to willfully conceal a material fact and to make a materially false statement to law enforcement.

### E. Obstruction of Justice: Corrupt Persuasion

To meet its burden for Count 2, the government must prove that Amri attempted to corruptly persuade Queen to "prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense[.]" 18 U.S.C. § 1512(b). Amri admitted that he attempted to persuade Queen not to disclose information about Qamar to the FBI, FOF ¶ 20, and the evidence makes it clear that he coordinated with Queen to tell the FBI the same false story that the only person they knew to support ISIS was a tall Indian man, FOF ¶¶ 12, 14.[6] Amri's mens rea is established by his

---

[6] Amri also asserts that it was impossible for him to persuade or attempt to persuade Queen to conceal Qamar's support for ISIS from the FBI, because Queen later told the CW that he would "never throw a Muslim underneath the bus." [Dkt. 73] at 14 (quoting FOF ¶ 14). According to Amri, this statement reveals that Queen was essentially immune to persuasion. This argument

admission that he did so "because he did not want Qamar . . . to be questioned by the FBI," id. ¶ 18, meaning that he intended to "prevent the communication . . . to a law enforcement officer . . . of information relating to the . . . possible commission of a federal offense," 18 U.S.C. § 1512(b).

Amri raises two arguments to support his defense that he lacked the requisite intent to obstruct justice. First, he argues that because it is stipulated that "he indicated he was unaware that Qamar had attempted to do anything illegal, and did not believe Qamar was capable of breaking the law," FOF ¶ 24, he lacked the requisite intent to prevent the FBI from learning about the "commission or possible commission of a Federal offense." [Dkt. 73] at 11. This argument fails because the government has not stipulated that Amri in fact did not think Qamar was capable of illegal activity. That stipulation merely provides that Amri "indicated" as much. See FOF ¶ 24. The FBI is a law enforcement agency, and Amri knew it was investigating support for ISIS, a terrorist organization. It is simply not credible that Amri, who had two years of college education and had engaged in the complexities of running a business, see FOF ¶ 25, failed to realize that, at a minimum, the FBI was investigating possible criminal activity.[7] Similarly, Amri's argument that Qamar's mere affiliation with ISIS would not constitute material support is beside the point. Although Amri may not have known the full extent of Qamar's activities when he was interviewed, FOF ¶ 24, based on the FBI's interest Amri assuredly knew that the FBI was looking into a "possible commission" of a federal crime.

---

overlooks the statute's prohibition on "attempted persuasion;" even if Amri's statements were not necessary to persuade Queen, his efforts to do so violated § 1512(b).

[7] Additionally, the government did not even need to prove that it was Qamar who committed the possible criminal violation in question. For all Amri knew, the FBI might have been interested in questioning Qamar about some other person's violation of the law. It is Amri's intent to prevent the FBI from questioning Qamar that establishes his mens rea.

In his second argument regarding the mens rea requirement of § 1512(b), Amri cites a circuit split, arguing that he cannot be convicted for merely encouraging someone to withhold information from the FBI. [Dkt. 73] at 10–13. As the government has correctly argued, this case does not implicate that circuit split. Amri relies on cases from the Third and Ninth Circuits, which addressed whether "one can be convicted for witness tampering under 18 U.S.C. § 1512 by encouraging a witness to withhold testimony when that witness possesses a legal right or privilege not to testify." United States v. Doss, 630 F.3d 1181, 1183 (9th Cir. 2011); see also United States v. Farrell, 126 F.3d 484, 488 (3d Cir. 1997). Those cases do not purport to address whether someone can be convicted for urging a witness to withhold non-privileged testimony.[8] See Doss, 630 F.3d at 1183; Farrell, 126 F.3d at 488. More importantly, both cases make clear that encouraging someone to give false information unambiguously qualifies as "corrupt" persuasion. Farrell, 126 F.3d at 484 ("Thus, we are confident that . . . attempting to persuade someone to provide false information to federal investigators constitute[s] 'corrupt persuasion[.]'" (emphasis in original)); Doss, 630 F.3d at 1186. That is exactly what Amri did when he encouraged Queen to falsely state that the only person he knew to support ISIS was a tall Indian man. Accordingly, the circuit split regarding § 1512(b) does not afford Amri any assistance and he will be found guilty of Count 2.[9]

---

[8] Amri argues that it is the government's burden to prove beyond a reasonable doubt that Amri did not hold a reasonable belief that Queen might have a privilege. [Dkt. 73] at 12. Imposing a burden on the government to essentially prove a negative would significantly extend the reasoning of Doss and Farrell, a step this Court is unwilling to take. Moreover, Amri has not pointed to any evidence in the record that he held such a belief. Instead, Amri has stipulated that he acted to protect Qamar, not Queen. FOF ¶ 18.

[9] Amri has also argued that these cases require that his motive be "selfish" as opposed to "selfless." This argument plainly fails. Doss gives "self-interest in impeding an investigation" as one example of an "improper purpose," but does not suggest that it is the only motive that would satisfy the "improper purpose" requirement. 630 F.3d at 1186.

### F. Obstruction of Justice: Misleading Conduct

For Count 3, the government must prove that the each defendant "engage[d] in misleading conduct toward another person, with intent to . . . prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense[.]" 18 U.S.C. § 1512(b)(3). Specifically, the indictment charges that the defendants "engaged in misleading conduct by telling the FBI that the only person they knew who might support ISIS, or travel overseas for the purpose of joining ISIS, was a 'tall, thin, Indian' individual[.]" [Dkt. 31] at 5. Although the Court agrees that the defendants engaged in the charged conduct, it finds that this conduct does not fall within the scope of § 1512(b)(3) because neither defendant engaged in misleading conduct toward the type of other person covered by the statute.[10]

Statutory interpretation "begins with the statutory text, and ends there [if] the text is unambiguous." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004). "Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, the plainness or ambiguity of statutory language is determined not only by specific reference to the language itself, but as well by the specific context in which that language is used and the broader context of the statute as a whole." Yates v. United States, 135 S. Ct. 1074, 1081–82 (2015) (internal quotations and alterations omitted). Although the statutory usage of a word "[o]rdinarily . . . accords with its dictionary definition," "[i]n law as in life, . . . the same words, placed in different contexts, sometimes mean different things." Id. at 1082.

---

[10] Although the defendants did not raise this argument, the Court remains under an obligation to ensure that the government has met its burden of proof.

Section 1512(b)(3) prohibits, among other things, engaging in "misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense[.]" 18 U.S.C. § 1512(b)(3) (emphases added)  The key question here is whether "toward another person" includes misleading conduct directed to the same federal law enforcement officers who are being hindered, delayed, or prevented from receiving the communication about the relevant information.

Although it is possible to construe the term "another person" in isolation to mean any person besides the defendant, that reading becomes unnatural in light of the rest of the sentence. Cf. Yates, 135 S. Ct. at 1086 (concluding that "tangible object" meant only objects conventionally used to "record and preserve information" in part because it was "unnatural" to refer to "falsifying" or "making false entries in" other types of objects).  In particular, applying the statute to the conduct charged in the indictment would require a defendant to have engaged in misleading conduct toward federal law enforcement officers with the intent of preventing these same officers from communicating that information to themselves.  This interpretation makes little sense.  "Communicate" is not a reflexive verb, and English speakers do not ordinarily talk about a person "communicating" information to himself.  See "Communicate," Am. College Dict. (1970 ed.).  Other provisions of the Code demonstrate that Congress knows how to criminalize lying directly to federal law enforcement officers using more conventional syntax when that is its aim.  See, e.g., 18 U.S.C. § 1001 (prohibiting making "any materially false, fictitious or fraudulent statement or representation" "in any manner with the jurisdiction . . . of the Government of the United States").

Additionally, the caption of the section, "Tampering with a witness, victim, or an informant," reinforces the conclusion that "another person" has a more circumscribed meaning in the context of § 1512(b)(3). Cf. Yates, 135 S. Ct. at 1083 (relying on the caption of another obstruction statute, 18 U.S.C. § 1519, to conclude that a fish is not a "tangible object" for purposes of that section); see also id. at 1090 (Alito, J., concurring in the judgment). The title clearly indicates that Congress' focus when enacting § 1512 was on conduct that prevented a third party from communicating pertinent information to federal authorities. Notably absent from the statute's focus on witnesses, victims, and informants is any mention of tampering with, or otherwise misleading, federal officers directly. This stands in contrast to other provisions of the Code that more generally address obstruction of justice, including 18 U.S.C. § 1503 ("Influencing or Injuring Officer or Juror Generally"); 18 U.S.C. § 1505 ("Obstruction of Proceedings Before Departments, Agencies, and Committees"); 18 U.S.C. § 1510 ("Obstruction of Criminal Investigations"); and 18 U.S.C. § 1511 ("Obstruction of State or Local Law Enforcement."). Accordingly, the caption of § 1512 provides strong evidence that § 1512(b)(3) is not violated by directly misleading a federal law enforcement officer.

Recognizing the ambiguity in the phrase "another person," it is appropriate to examine whether the legislative history supports a particular reading. See Lee v. Norfolk S. Ry. Co., 802 F.3d 626, 631 (4th Cir. 2015) ("[I]f the text of a statute is ambiguous, we look to other indicia of intent such as the legislative history to interpret the statute." (internal quotation omitted)). Here, the legislative history further demonstrates that Congress intended the statute to apply to conduct directed at persons other than federal law enforcement officers. Congress passed this statute as part of the "Victim and Witness Protection Act of 1982," Pub. L. No. 97-291, 96 Stat. 1248 (1982). The Senate Judiciary Committee Report accompanying that passage plainly states that

23

§ 1512 "applies to offenses against witnesses, victims, or informants which occur before the witness testifies or the informant communicates with law enforcement officers[.]" S. Rep. No. 97-532, at 14 (1982). As with the caption, this description of persons protected by § 1512 omits federal law enforcement officers. Futher, by explicitly stating that the offense occurs "before" communication with law enforcement, the legislative history offers compelling evidence that § 1512 does not encompass misleading conduct aimed directly at federal law enforcement officers. The Senate Report further discusses who constitutes a witness, explaining that "[t]he scope of the offense should not be limited . . . [to] a person who has testified or will be able to testify in court. Rather, the offense should be addressed to punishing the acts of intimidating or injuring a person because of his knowledge about the commission of a crime." Id. This definition of "witness," broad though it is, does not encompass the investigating officers; rather, it reinforces the notion that the person "with knowledge" is targeted to prevent him or her from passing that information on—that is, "communicating it"—to federal law enforcement personnel.

More generally, the Senate Report clarifies that Congress' focus was on ensuring that a "victim or witness who cooperates with the prosecutor" did not have to do so "at his own risk." Id. at *9. Congress gave no indication that it was also focused on directly insulating law enforcement officials from misleading conduct with this Act, nor did it need to be in light of 18 U.S.C. § 1001, which prohibits making false statements to federal officials.[11] Moreover, the facts of this case illustrate the overlap that such a reading would create—both Count 3 (under § 1512(b)(3)) and Counts 4 and 5 (under § 1001) are premised on the same false statements by

---

[11] Section 1001 addresses false, fictitious or fraudulent statements in matters within the jurisdiction of the executive, legislative, and judicial branches, whereas § 1512 addresses preventing communication to law enforcement officers and federal judges.

24

the defendants.  The substantial duplication with § 1001 created by also charging the defendant's

under § 1512(b)(3) further counsels against such a broad reading.  Cf. Yates, 135 S. Ct. at 1085.

Although the Fourth Circuit has not addressed the scope of § 1512(b)(3), the Court is

aware that a handful of cases in other jurisdictions have reached a contrary result.  See United

States v. Hawkins, 185 F. Supp. 3d 114, 125–26 (D.D.C. 2016); United States v. Cotton, No. 06-

cr-20084, 2006 WL 2927675, at *2–3 (E.D. Mich. Oct. 12, 2006); United States v. Smith, No. 00

CR 785-1, 2001 WL 1568851, at *3–4 (N.D. Ill. Dec. 10, 2001).  These opinions do not take

stock of the considerations laid out above.  Instead, they rely on the reasoning of the Fifth Circuit

in United States v. Veal, 153 F.3d 1233, 1238 (11th Cir. 1998), overruled on other grounds by

Fowler v. United States, 563 U.S. 668 (2011), which concluded that "another person" is broad

enough to include state and local law enforcement officers.  Veal does not undercut this Court's

view that "another person" does not extend to federal law enforcement officers to whom the

misleading conduct is directly made.  Misleading conduct toward state or local officials with the

intent to prevent them from communicating relevant information to federal law enforcement

officers poses the same problem Congress wanted to solve with this statute:  to ensure that those

with information relevant to a federal criminal investigation would not be misled or intimidated

to withhold that information from federal investigators.  The cases that have extended Veal to

encompass directly misleading federal officials have done so by focusing exclusively on the

word "another," finding that "another" unambiguously means "any" other person.  See e.g.,

Hawkins, 185 F. Supp. 3d at 125–26.  That reasoning runs afoul of Yates' command to examine

the context of a word to determine its unambiguous meaning, and disregards the role that the

caption of the statute and the role that the word "communication" plays in construction of the

statute.  Yates, 135 S. Ct. at 1079, 1081–83; see also Gustafson v. Alloyd, 513 U.S. 561, 583–84

(1995) (defining the phrase "any . . . other communication" as a "term of art" that includes only "a public offering of securities by an issuer or controlling shareholder"). A contextual reading of the statute reveals that "another" person does not unambiguously mean literally "any other" person. Informed by context and legislative history, the phrase as used in § 1512(b)(3) is better understood to exclude federal law enforcement officers.

For these reasons, the Court holds that to meet its burden under § 1512(b)(3) the government must prove that the defendants engaged in misleading conduct toward someone besides the investigating federal law enforcement agents themselves. In this case, because the only factual bases for this charge are the statements that Amri and Queen gave to the FBI agents on July 24, 2017, the government has not met its burden as to Count 3 as to either defendant. Accordingly, both Amri and Queen will be acquitted of the charge in Count 3.

### G. False Statement Charges

For Counts 4 and 5, the government must prove that Amri and Queen respectively knowingly and willfully made a "materially false . . . statement" regarding a matter "within the jurisdiction of the executive . . . branch of the Government of the United States." 18 U.S.C. § 1001(a). Both defendants have admitted that on June 24, 2016, they told the FBI that the only person they knew who voiced support for ISIS was a "tall, thin, Indian" man. FOF ¶¶ 12, 13. As the Court has already found, each defendant knew that statement was false because they knew that Qamar supported ISIS, id. ¶¶ 11, 18, and had attempted to travel to Turkey to join ISIS, id. ¶¶ 11, 19. The mens rea element[12] is clearly established by their admissions that they did not want Qamar to be questioned by the FBI. Id. ¶¶ 18, 26.

---

[12] Amri argues that, because the Solicitor General has in the past taken the position that § 1001 requires a defendant's statement to be made with knowledge that his conduct was unlawful, "the government is required under the doctrines of judicial estoppel, equitable estoppel, and

Amri argues that a defense to knowingly making a false statement to a federal law enforcement officer exists when the government engages in misconduct by asking a defendant questions that the government agent knows the defendant will lie about for the sole purpose of entrapping the defendant in an obstruction charge. See Def. Rep., [Dkt. 65] at 7–8 (citing Brogan v. United States, 522 U.S. 398, 408 (1998) (Ginsburg, J., concurring in the judgment)). Whether such a defense has been recognized is an open question; however, if it is a defense, the record here does not support it. Rather, the stipulated facts establish that in June of 2016, the government was engaged in an honest effort to learn more about Qamar and any potential associates, and in July of 2016, the government was trying to learn more about why Amri and Queen were not forthright during their first interviews. FOF ¶¶ 12, 18. Accordingly, there is no hint of entrapment in this record.

For these reasons, Amri will be found guilty of Count 4 and Queen will be found guilty of Count 5.

## H. Application of Terrorism Enhancement

The government seeks to apply the terrorism enhancement to the convictions for Counts 4 and 5, which would raise the statutory maximum term of imprisonment for these § 1001 convictions from 5 years of imprisonment to 8 years "if the offense involves international or domestic terrorism (as defined in section 2331)." 18 U.S.C. § 1001(a). Because this enhancement raises the statutory maximum term of imprisonment, the government must prove that it applies beyond a reasonable doubt. Apprendi, 530 U.S. at 490. Both defendants argue

---

constitutional due process, to declare that this is a correct statement of the law." [Dkt. 73] at 15. That argument has no legal basis. Moreover, Amri has stipulated that the FBI began the June 24 interview by stating that lying to the FBI is a federal offense. FOF ¶ 12. Amri's suggestions that he might not have heard or understood this extremely clear statement are unsubstantiated by the record and are not credible. See [Dkt. 73] at 16.

that the government has not proven that their offenses "involved international terrorism" as defined by 18 U.S.C. § 2331.

Defendants first argue that the stipulated facts do not explain "whether the organization to which [the stipulation] is referring [i.e., ISIS] was involved in terrorist acts" and that, according to the trial stipulations, this Court cannot consider any "evidence or facts" beyond the stipulated facts. [Dkt. 55] ¶ 2. Amri's counsel has suggested that "ISIS" might be referring, for example, to a legitimate business organization or the ancient Egyptian goddess of the same name.

In essence, this argument asks the Court not to draw reasonable inferences from the stipulated facts. Although the parties have stipulated that no additional evidence may be considered, they have not stipulated that the Court, as factfinder, cannot apply common sense to the facts presented. Cf. United States v. Cortez, 462 U.S. 213, 418 (1981) ("Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same[.]"). Based on defendants' acknowledgement that they knew about Qamar's attempt to go to Turkey to join "ISIS," and that the FBI was investigating Qamar's connections to "ISIS," the Court has no hesitation in concluding that the "ISIS" at issue in this case is the Islamic State in Iraq and Syria, an international terrorist organization. Moreover, if ISIS were a legitimate business organization, why would the defendants have lied about Qamar's interest in it? Their conduct is further evidence that "ISIS" refers to the terrorist organization.

Defendants' second argument regarding the terrorism enhancement is that the government has not proven that the offense "involved [international] terrorism" as defined by 18 U.S.C. § 2331. That section defines "international terrorism" as "activities that," among other

requirements, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A).

The evidence in the stipulated record supports the conclusion that Amri and Queen's "offenses"—that is, the lies that they told the government— were sufficiently related to "violent acts or acts dangerous to human life" to support applying the enhancement. Qamar attempted to join the Islamic State, an organization which "regularly and routinely engages in violent acts and acts dangerous to human life." [Dkt. 71] at 9. Certainly "attempting to provide oneself to a designated terrorist organization" is at least, if not more, dangerous to human life than merely providing money. [Dkt. 71] at 4; cf. Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (concluding that giving money to Hamas involved an act "dangerous to human life"). Accordingly, Amri and Queen's false statements regarding Qamar's attempt to join ISIS involved an act dangerous to human life, making it appropriate to apply the terrorism enhancement to the § 1001 charges.

## IV. CONCLUSION

For the reasons stated above, an Order will issue documenting Amri's conviction of the offenses in Counts 1, 2, and 4; Queen's conviction of the offenses in Counts 1 and 5; the acquittal of both defendants as to Count 3; and setting a date for their sentencing.

Entered this 31st day of July, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge