IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:17cr50 (LMB) |
| SOUFIAN AMRI | ) | |
| | ) | |
| Defendant. | ) | |

<u>SENTENCING MEMORANDUM</u>

COMES NOW, the defendant, Soufian Amri, and respectfully submits his position with respect to sentencing. Counsel submits that a sentence of probation is sufficient but not greater than necessary in this case. Counsel also submits that this sentence is the intuitively appropriate sentence, the common sense sentence given the totality of the circumstances case, and consistent with the sentences in other cases. The guidelines, however the court calculates them, should not prevail over common sense.

I.      PSR Objections

1.  The terrorism enhancement under USSG § 3A1.4(a)

As the Court is aware, the reason this case went to trial was because of the terrorism enhancements sought be the government. The PSR concludes in its addendum that without the § 3A1.4 terrorism enhancement, the sentencing guidelines without acceptance of responsibility come to a low end calculation of a base level offense of 20, with a low end sentencing recommendation of 33 months. The application of the terrorism enhancement results in a low end of 210 months, which is an effective ***seventeen*** (17) level enhancement.[1] In the fraud context, it

---

[1] For a Category I offender, the enhancement to Category VI is equivalent to 5 additional guideline levels.

would be the difference between the theft of a $10 gift card, and a $3,000,000 fraud. It is among the most, if not the most, serious enhancements that can be applied by the Court in any case, and is potentially far more impactful than anything that occurred at trial.

The burden for showing the enhancement rests with the government. *United States v. Assi*, 586 F. Supp. 2d 841, 847 (E.D. Mich. 2008), *aff'd*, 428 F. App'x 570 (6th Cir. 2011) ("As the Government correctly observes in its sentencing memorandum, it bears the burden of showing by a preponderance of the evidence that the elements of the § 3A1.4 enhancement are satisfied here."). In the context of the "obstruction" application note, it is a very difficult burden to meet, and in only one instance nationally has a prosecutor ever sought and obtained the application of the enhancement. *See United States v. Benkahla*, 501 F. Supp. 2d 748, 761 (E.D. Va. 2007), *aff'd,* 530 F.3d 300 (4th Cir. 2008) ("before this case, no defendant has ever received an enhancement under § 3A1.4 for obstructing a terrorism investigation."). And *Benkahla* apparently remains the only instance after numerous other failed attempts. *Id.* at 756 ("In *Biheiri III,* the government sought the terrorism enhancement in the obstruction context after two previous failed attempts. *See United States v. Biheiri,* 299 F.Supp.2d 590 (E.D.Va.2004); *United States v. Biheiri,* 341 F.Supp.2d 593 (E.D.Va.2004).").  Judge Ellis also rejected it in the third case.

The Court in *Biheiri III* concluded that "§ 3A1.4 applies only where the conduct in issue actually obstructs an investigation of a federal crime of terrorism."  *United States v. Biheiri*, 356 F. Supp. 2d 589, 599 (E.D. Va. 2005).  By contrast, the statutes of conviction in this case only require that the statement be false and material, they do not require, and the court did not find, that the statements successfully thwarted an investigation, and no such event happened in this case. Where the agents have actual awareness of the falsity at the time it occurs, there inherently can be no "actual" obstruction."  *Id.* at 600 ("the agents who interviewed Biheiri had actual knowledge

that Biheiri's statement regarding his relationship with Marzook was false . . .thus Biheiri's false statements caused no actual obstruction of their terrorism financing investigation."). In this case, as the government notes in its sentencing memo "the FBI learned in 2015 of Qamar's attempted travel in 2014." In numerous recorded conversations in 2015 and into early 2016, Qamar had detailed the circumstances of his travel. There was no actual obstruction in this case. And when agents questioned Qamar at his arrest, they showed him the relevant flight reservation with his email and phone number, establishing there were even knowledgeable of the specific flight at issue.

The fact that there was no actual obstruction is further cemented by the fact that merely two weeks after Amri's initial false statement on June 24, on the date of Qamar's arrest, July 8, agents returned to re-interrogate Amri. This time, they specifically asked about Qamar, and Amri told the agents everything he knew, as Qamar had earlier done that day. At Amri's interview on July 8, the FBI stated that "the good thing is that [Qamar]'s come clean about this. Otherwise, I think this conversation would have been a little different. If we came in here and you know he hadn't had told us any of that. We would have been more concerned about you. But it lines up with what we saw you know over the last year and a half." ECF 68, Doc #1 at 48:58. They stated the same point in articulating that Qamar was "being honest to the degree that we were able to tell from our investigation." *Id.* at 4:38. And when Amri came clean, the FBI stated that "everything you told us up to now has been honest. It all matches with Harris." *Id.* at 48:58.

According to the investigative reports Qamar "first told Mike and Soufian about his plan to travel to join Dawlah at the gazebo outside Seoul PC. They didn't expect to hear what they were hearing when he told them, they were just frozen. They said Qamar was a 'fucking idiot' when they [sic] told him [sic]. Qamar said they are his best friends. Soufian is trying to do a

3

granite business and is trying to get Qamar to buy into it so Soufian can help Qamar out."  Qamar had also told the FBI that Amri "kind of tried to talk him out of it, right?"  ECF 68, Doc #1 at 4:38.

Further support for the inapplicability of the enhancement is found in Judge Ellis' opinion comparing the general obstruction provision with the terrorism obstruction provision.  Judge Ellis noted that "the general obstruction-of-justice Sentencing Guideline, provides for a comparatively modest two-level enhancement."  *Biheiri,* 299 F.Supp.2d at 598.  That provision has the lesser requirement that the government need only show *either* that the defendant "obstructed or impeded, *or attempted to obstruct or impede*."  *Id.* (emphasis in original).  The fact that the 2 level enhancement has lower requirements is logical in light of the difference between a two level and a 17 level enhancement.  Additionally, the Court noted in *Biheiri* that even under lesser standards required by the two level enhancement, there must be "a materially false statement to a law enforcement officer that *significantly obstructed* or impeded the official investigation."  *Id.* at 599, n.14. (emphasis in original).  The Court also agreed that "assuming *arguendo* that § 3A1.4 were deemed ambiguous in this respect, then, to be sure, the rule of lenity would apply as it is now settled that Sentencing Guideline factors are essentially elements of the crime."  *Id.* at 599, n. 15.

In the one and only case in which the government has obtained the application of the enhancement, the defendant permanently obstructed the investigation by refusing to provide information even after he was given an opportunity to come clean.  *United States v. Benkahla*, 501 F. Supp. 2d 748, 757 (E.D. Va. 2007), *aff'd,* 530 F.3d 300 (4th Cir. 2008) ("***because of Defendant's*** false or intentionally misleading ***answers***, the Government ***still does not*** know the identity or whereabouts of the persons about whom Defendant was questioned, their involvement with Lashkar-e-Taiba, and their role in aiding persons to obtain jihad training. Since Defendant gave false and misleading answers in the investigation, and the Government did not, and in some cases,

*still does not*, possess the specific information which it sought, the Court concludes that Defendant actually obstructed the FBI's investigation.") (emphasis added).  Indeed, the defendant in that case was so committed to persisting in his falsehoods that he was convicted of committing *perjury, twice,* and also lied to the FBI and was convicted of that as well.  That is the type of "significant obstruction" which Judge Ellis and Judge Cacheris indicated would be necessary.  *Benkahla* is the only case in which the enhancement has been applied for good reason, and it would be inappropriate to extend the application of the enhancement to the instant case, in which the relevant facts are closer to those of *Biheiri*.

As a last point, the scienter requirement is also unmet as the application is established only where "the defendant knew he was lying about facts relevant to an investigation of a federal crime of terrorism."  *United States v. Biheiri*, 356 F. Supp. 2d 589, 599 (E.D. Va. 2005) (citing *United States v. Maflahi,* No. 03-CR-412 (E.D.N.Y. July 9, 2004)).  As set forth in *United States v. Benkahla*, 501 F. Supp. 2d 748, 752 (E.D. Va. 2007), "[t]he definition of a 'federal crime of terrorism' limits the enhancement's application to specific investigations."  Therefore, the defendant must "know" that his false statements are obstructing a "specific investigation."  However, at the time the false statement was made, Amri was only questioned about Queen, and he was unaware there was a specific investigation occurring into Qamar.  Therefore, although his false statement may have in fact related to a specific investigation, Amri was unaware of that specific investigation, and his lack of the requisite scienter requirement is yet another reason why the enhancement fails to apply in this case.

2.  Acceptance of Responsibility

The defense submits that the acceptance of responsibility departure applies under the unusual nature of this case.  The commentary to the guidelines, note 2, states that "in each such

5

instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." The pre-trial statements alone would qualify because his pre-trial statements, like with a statements of facts under a plea of guilt, were sufficient to establish the offenses of conviction. And with respect to pretrial conduct, both defendants offered to plead guilty, even to multiple felonies, but wanted to preserve appellate rights with respect to the applicability of the terrorism enhancements, because of a concern that they do not apply as a matter of law to the uncontroverted facts of the case. The dispute over the applicability of these enhancements, alongside disagreements over the ability to preserve those disagreements on appeal, is why this case went to trial.

The probation officer has accepted the government's argument that the closing arguments of defense counsel alone can negate acceptance of responsibility which would otherwise be present. We respectfully disagree. These were the arguments made by counsel, and the defendants themselves were not aware of the specific arguments which would be made orally or in writing. Secondly, these are not the types of "false denials" of facts prohibited by the guideline application note 1(A). The defense stipulated to every evidentiary fact in this case. No witnesses were cross examined, no credibility was tested, and no trial evidence was stated to be, or even suggested to be, false. Rather, counsel made the legal argument that the evidence submitted was legally insufficient to prove the charged offenses. There is an important distinction between saying that "the ISIS in this case is not a terrorist organization" and "the government has failed to adduce sufficient evidence that the ISIS in this case is a terrorist organization." The former is a false denial, the latter is simply a legal argument. Legal argument inherently cannot contain false statements, but can at most contain a flawed legal argument.

At closing argument, defense counsel has an ethical obligation to make all non-frivolous arguments with respect to the offenses at issue, and the arguments made were made consistent with the ethical obligations of counsel. Were it otherwise, it would mean that if a defendant goes to trial solely to preserve a pure issue of statutory construction, but at trial the government fails to prove an element of the offense, defense counsel is *barred* from letting the court know and is required to sit silently while the court convicts the defendant on an offense for which there was insufficient evidence presented. That cannot be the rule.

It is for this reason that the guidelines themselves suggest that the arguments of counsel should be given little if any weight, because, and what matters is the pre-trial statements and conduct of the defendant. Here, those statements and conduct, had defense counsel made no closing argument, would clearly entitle the defendant to acceptance of responsibility credit. And defense arguments should be given especially little weight here, in a bench trial, in which the court acquitted on arguments not made by counsel and legally set aside the arguments that were made. The court in a bench trial is fully capable of conducting, and did in fact conduct, its own legal analysis independent of the arguments made by counsel, and would have arrived at identical results absent those arguments. As such, the court should apply this departure, and reduce the defendant's offense level accordingly.

II.     Departure provisions

        a.   Aberrant behavior

This departure is available where the defendant has not been disqualified by a conviction of certain sex offenses under U.S.S.G. § 5K2.20(a), meets the requirements of U.S.S.G. § 5K2.20(b), and is also not disqualified based under U.S.S.G. § 5K2.20(c). Here the defendant was not convicted of a sexual offense covered by subsection (a). The criminal conduct at issue was

committed (1) without significant planning, (2) was of limited duration, and (3) represents a marked deviation from an otherwise law abiding life so as to meet the requirements of subsection (b).  Finally, Amri is not disqualified by subsection (c), as the offense did not involve serious bodily death or injury, a firearm, drug trafficking, and Amri does not have more than 1 criminal history point.  In evaluating the totality of the circumstances where the defendant is not disqualified by subsection (a) or (c), the guidelines ask the Court to examine not only the above three factors under subsection (b), but also five additional factors in application note 3, which include the defendant's (1) the mental and emotional conditions, (2) employment record, (3) record of prior good works (4) motivation for committing the instant offense, and (5) efforts to mitigate the offense.  These 8 factors are addressed in turn.

1.   The criminal conduct was committed without significant planning.

On the day in which the criminal conduct occurred, Amri had no idea he was about to become involved in any type of criminal activity.  When unexpectedly approached by the FBI, he initially made false statements, and then immediately thereafter had a conversation with Queen about them. Although it cannot be said that these acts involved no planning, it cannot be said that this constituted *significant* planning.  The modifier "significant" is found in the guidelines to distinguish between the type of planning in this case, and the type of "significant" planning that is found in an ordinary criminal enterprise.

2.   The criminal conduct was of limited duration

The false statements occurred only on June 24, 2016.  Both Amri's and Queen's statements occurred on that day, and there were no false or misleading statements made to the FBI on another day.  Moreover, two weeks later on July 8, Amri provided all the information he knew to the FBI.  The criminal conduct in this case was plainly of limited duration.

3.   The conduct represents a marked deviation from an otherwise law abiding life.

As reflected in the PSR, the defendant has a remarkably clean record, especially for a 31 year old male. In addition to having no criminal convictions in his life, resulting in 0 criminal history points, PSR paragraphs 65-67 show that he has not even been arrested or charged with any type of unlawful activity.  Until the offense in this case, the defendant's life has been flawlessly law abiding.

4.   The defendant's mental and emotional condition

With respect to the defendant's mental state, the offense in this case was motivated not by greed but, quite the opposite, by empathy.  As set forth in the stipulated statement of facts, paragraph 24, "AMRI indicated that given the length of their friendship, he viewed Qamar as family, as a 'brother,' and felt a duty to try to help him."  The FBI indicated their awareness of this motivation in their interview, stating in their interview with Amri "I know you were just like, totally understandable--family members, friends, you look out for them right? You go back and you wanna downplay the things they're doing. And believe in their hearts that you're doing the right thing. Right? And you wanna be protective of them."  ECF 68, Doc #1 at 4:38.  They continued later to say "That's not bad. That's like family protecting family." *Id.* at 33:27.  Amri explained that "[i]t's hard when you know someone and you can feel it in your heart that that person is really a good person and that he has just kind of warped viewpoints on  a lot of things and I love the guy. He's a good guy. Yesterday at The Cave he was helping me out. Like I would have been in a disaster. We had a bunch of Iraqi Shiite customers and he was treating them so well and so nice. It breaks my heart." *Id.* at 32:30.

Further, Amri was unaware of the troubling activity after 2014. As explained in the stipulated statement of facts, paragraph 24, "AMRI was unaware of the facts contained in paragraphs 2-9 of this document, except to the extent that AMRI was aware that Qamar generally 'was a frequent supporter of ISIS on the internet.'" That paragraph also explains that previously in 2014 "'sparked the conflict' with Qamar's parents that ultimately resulted in Qamar not going to join ISIS." The agents also acknowledge that Amri had "tried to talk him out of it." ECF 68, Doc #1 at 4:38.

As the FBI itself acknowledged, Amri acted as one would expect of any mother, father, or brother of someone who years ago had expressed an interest in criminal conduct, but who had expressed no such further criminal ambitions. Because he no longer believed Qamar to be a genuine risk, he was like a family member who "believe in their hearts that you're doing the right thing." *Id.* at 4:38. His mental condition was one of compassion, not greed or selfishness, and he was not motivated by the selfish thought that "[f]rom self-preservation stance point, I'll be like crap I'm gonna dime Harris out." *Id.* at 45:23. In the hundreds of cases defense counsel has handled in this court, this is the first in which the defendant stands convicted of an offense motivated purely by selflessness. The core of virtually every criminal offense is selfishness, and it is highly aberrational that an offense would be motivated purely by selflessness.

5.   The Defendant's Employment Record

PSR paragraph 83 reflects that since "August 14 the defendant started Cave Entertainment LLC . . . a 24-hour gaming center that opened in November 2015. According to the defendant, the business provides customers with access to computers and gaming systems for a fee. They also provide access to charities and local school systems for free or at a reduced rate. . . According to the defendant, the business is doing well; however, he and his partners have been forgoing regular

paychecks in order to ensure their three employees are paid and the business is kept running." Letters from others demonstrate Amri's sincere work ethic and commitment to the business and making it gainful.  *See* Exhibit A.

Jason Tate writes that "Soufian spends more time than anyone at The Cave and has put countless hours of hard work to not only rectify former mistakes made by all of us, but build for a successful future. On a weekly basis, Soufian operates close to 80 hours of front desk work a week at the business. This number alone displays his importance not only by an operational standpoint, but also from a cultural standpoint. Many of our original customers not only signed up with us through Soufian, but also continue to engage in business with us due to his professionalism and excellent customer service."  Craig Sackett echoes this thought, stating that in the business, Soufian is "always willing to do anything from menial tasks to addressing difficult financial issues.  Soufian is committed to honoring his investors and building an ethical business. While not yet drawing a salary, he rises to any occasion, regularly working 12 hour days, 7 days a week."   On page 3 of her letter, amongst her descriptions of Amri's value to the business, Kayla Merlino writes that Amri "is the responsible adult who is actually making this [business] run." And Paul Harris writes that "Soufian was diligent in working on the creation of our project. We took our concept and began the process of finding the property/location, getting new zoning, raising the capital, hiring an architect, and developing the space."

Collectively, the letters clearly reflect that the defendant was instrumental in the creation and maintenance of a business that has numerous partners and provides jobs for three paid employees, by routinely working 80 hours and doing all tasks from the most menial to the most stressful.  This type of dedication and commitment to his work and to the employment of others satisfies this consideration.

6.   Record of prior good works

Antoine Bridges notes that "When The Cave opened, [Amri] would let homeless people (mostly young adults in the gaming community) sleep in the business on the couches or in the computer chairs. He would offer them a chance to volunteer for a few hours here and there, cleaning or watching the front counter in exchange for food, drinks, computer time, and a place to get back on their feet."  And paragraph 83 of the PSR reflects that the business "provide[s] access to charities and local school systems for free or at a reduced rate."

Mohammed Albasha writes that Amri "would give you the shirt off his back. He is the person I would call if my car broke down in the middle of the night and I needed a lift. He is the person who would run to pick up my daughter from school if I was running late or stuck in traffic. He is dependable and his support is unlimited and unconditional. He was there for me during my father's treatment for cancer and was there for me when my father passed away. He's also the only uncle my daughters have and loves them more than anything in the world. I completely trust him with my daughters and have seen how well he cares for them and how much he loves them."

Saara Amri writes that "When I had my first daughter, I never once doubted that Soufian would be an amazing uncle, and in fact, he far surpassed our expectations in taking on that role. He was the first person to see my older daughter after she was born. I remember him waiting in the hallway as I was being carted out of the delivery room – I had yet to arrive to the recovery suit. We joke, but have always been serious when saying that he took better care of my daughters than even their own father did. When he was unemployed, he volunteered to take care of my daughter while I was at work – and he enjoyed it! If something were to ever happen to me or my husband, Soufian is the person we would choose to be their guardian."

Craig Sackett notes that "even as a young teen, Soufian always made sure that Grandmothers were comfortably seated and teacups were full.  He insisted on helping in the kitchen and always remember to thank his hosts."   His former neighbor Carolyn Johnson writes that since childhood he has discouraged improper behavior, writing that "[a]s a child and young man Soufian sought to counsel his playmates, friends, and neighborhood acquaintances who displayed mischievous and inappropriate behavior."

His mother Judith Amri writes that he is "a gentle person who has tremendous empathy for others, who is generous sometimes to a fault, and would go out of his way to help someone else solve a problem or give someone else his last dollar."  She further observes that "In High School he earned a reputation for intervening between conflicting groups and helping prevent fights. He also became known for standing up for the bullied students and confronting those doing the bullying."

Kayla Merlino writes of an occasion in which "Soufian willingly take up the role of nurse even out of sight of my parents' watchful gaze. He did everything from making me tea to setting up my breathing treatments to bringing me my medication to helping me dress when the lethargy became too much." Later Soufian took her to the "ER, where I spent six hours hooked up to an IV and a nebulizer full of albuterol and steroids. He sat beside my hospital bed and updated my boss and my family, coordinating with my doctor to get a note exempting me from work, and trying to catch up with everything he has missed at his work. We found out that not only did I have strep throat, but I also.was diagnosed with the flu and pneumonia. He purchased my medication, bought me some necessary groceries, and took me home."  In addition to helping her, Amri also helps with "the familial responsibility of caring for his elderly mother and his two young nieces."

Finally, it was a good act that Amri tried his best to redirect Qamar away from ISIS and towards a productive life.  As set forth in paragraph 24 of the stipulated statement of facts "AMRI said he (AMRI) 'sparked the conflict' with Qamar's parents that ultimately resulted in Qamar not going to join ISIS. AMRI would scold Qamar when Qamar referred to ISIS positively. Subsequent to learning about the 2014 trip, AMRI told Qamar he needed to focus on school, and get his 'civil engineering degree' so that he could 'help people in the right way.' Qamar had previously indicated to AMRI an interest in 'building water and irrigation in Pakistan' which is lacking in adequate amounts of those facilities, and AMRI looked online at possible courses and encouraged Qamar to take the appropriate courses, including waste management courses. AMRI is hoping to start a granite business in the future, and would be willing to give Qamar a job in the business one day, in the hopes of redirecting Qamar towards more productive and appropriate endeavors."  And the FBI echoed this, telling Amri that Qamar had told them that "Qamar told you guys . . . that he was trying to travel. And that you had tried to talk him out of it. To a certain degree. You said that you're being stupid. You going about this the wrong way, which is exactly what I think you explained. There's other avenues to do this. Whether it's other groups or whatever something that's not . . . ISIS, which is stupid.  Amri: I told him to get a civil engineering degree and help people the right way." *Id.* at 51:38.

In sum, Amri has a lifelong record of being a giving, compassionate and generous individual, and this factor also weighs in favor of the departure.

7.    Motivation for committing the instant offense.

As set forth above under factor 4, the motivation for the offense was, very unusually, a selfless one--namely to help protect someone he viewed akin to a family member.  While virtually

14

all criminal offenses are the result of selfish motives, the motivation here is unique and also weighs in favor of the departure.

      8.  Efforts to mitigate the offense

Two weeks after the offense, Amri came clean to the FBI and told them what he knew.  His honesty was acknowledged and appreciated, as the FBI indicated that "everything you told us up to now has been honest. It all matches with Harris right. *Id.* at 48:58.  The FBI had earlier indicated that "the good thing is that [Qamar]'s come clean about this. Otherwise, I think this conversation would have been a little different. If we came in here and you know he hadn't had told us any of that. We would have been more concerned about you. But it lines up with what we saw you know over the last year and a half." *Id.* at 13:21.  By disclosing all of his knowledge only two weeks after the false statement, which corroborated the statements of Qamar and the prior investigation, Amri did what he was able to do in order to mitigate the offense.  This factor also weighs in favor of the defendant.

The multifactor test establishes that the defendant is among the rare case in which this departure is appropriate.  When the drafters of the guidelines were contemplating people who should benefit from this departure, someone like Amri would have clearly come to mind.  The Court should award this departure.

    **b.  U.S.S.G. 5K2.0 (business impact)**

The Sixth Circuit has noted that "the First and Second Circuits have both found that business impact is a permissible consideration in considering whether to grant a downward departure." *See United States v. Olbres,* 99 F.3d 28, 36 (1st Cir.1996); *United States v. Milikowsky,* 65 F.3d 4, 9 (2d Cir.1995); *Holz*, 118 F. App'x at 939.  It does not appear that the Fourth Circuit

has spoken to this issue, but Judge Lee appears to have made the same finding in *United States v. Gerdak* 1:12 cr 457 (EDVA).

As reflected in the PSR at paragraph 83, Amri has "been forgoing regular paychecks in order to ensure their three employees are paid and the business is kept running." These are three individuals whose livelihood and whose families livelihoods depend on Amri, and who have nothing to do with this case. Moreover, there are also three business partners who also have nothing to do with this case, whose investment will disintegrate if Amri is incarcerated. The many letters collectively make it very clear that the business cannot survive without Amri, and was barely able to survive the 6 days of incarceration at the commencement of this case.

Antoine Bridges writes "The Cave has flourished only because of Soufian's presence, because he is more approachable than the other owners and employees, and he resolves issues right away. When someone's computer crashes or they have a problem with it, he helps them onto a new computer and compensates their time in a way that does not leave them inconvenienced. He takes the time to talk to new customers and learn everyone's name, which brings people back even though the computers have problems and really need to be upgraded."

Jason Tate writes that "As a fellow owner and partner of Soufian, I cannot stress his importance to the business and his role as the lifeblood that keeps it operating. Soufian spends more time than anyone at The Cave and has put countless hours of hard work to not only rectify former mistakes made by all of us, but build for a successful future. On a weekly basis, Soufian operates close to 80 hours of front desk work a week at the business. This number alone displays his importance not only by an operational standpoint, but also from a cultural standpoint. Many of our original customers not only signed up with us through Soufian, but also continue to engage in business with us due to his professionalism and excellent customer service. He does this for the

16

business at no cost and his loss would be a great negative economic impact to the business, especially at such a critical moment as we seek to recover from another owner who was mismanaging funds."

Kayla Merlino writes that "when he was arrested in February 2017, everyone realized how much the business relied on him. We had almost completely eliminated our losses by fine-tuning the payment process, but things went to hell in a handbasket quickly without him. People started sneaking past our systems again. Employees began relaxing and neglecting vital tasks, and for a week we were bleeding money just like we used to. The appearance and management of the store quickly deteriorated with only a few lazy employees, myself, and Soufian's elderly parents trying to take on all of the tasks that Soufian seemed to so effortlessly juggle. The necessary computer issues were put on the backburner, and customer service issues were not properly handled, leading to a loss of loyal customers and vital revenue. Customers with running tabs took advantage of unfamiliar faces at the front and lied about making payments on their bill, and others still tried to weasel around our computer program to play their games without having to pay. The other managing member in charge just bungled every customer service complaint to the point that when Soufian returned, he had to apologize to those customers for the words/actions of his business partner when these customers were the ones who had initially been in the wrong! . . . Things quickly went back to normal when he returned. . . He is the responsible adult who is actually making this run, and those working with him are largely immature and irresponsible, but Soufian tolerates it because he hates conflict and everyone takes advantage of his being the compassionate, hard-working guy who lets everyone else skate by."

The other letters echo these same concerns, and make clear that the business will not and cannot survive a substantial period of incarceration. The Court should take into account the many innocent employees, owners and families who would be harmed by incarceration.

### c. U.S.S.G. § 5K2.0 (circumstances not adequately taken into consideration)

This case is likely the only case in the history of the terrorism enhancements where the guidelines are elevated due to the case "involving terrorism," but in which the defendant was actually opposed to terrorism and had taken affirmative steps to stop it. The stipulated statement of facts, the transcript of the interview with Amri, and the many letters clearly establish that Amri is a proud American who is deeply opposed to violence, including its manifestations within ISIS. He did what he could to arrest Qamar's interest in, and travel to, ISIS, by continually attempting to find productive work for him or assist him with coursework. The guidelines do not contemplate, a defendant who makes false statements involving terrorism solely to protect a family member, but who is actually opposed to terrorism and has taken active steps to stop their family member from being involved in it. The FBI itself told Amri that it understood why Amri had earlier decided he was "not gonna throw our friend under the bus. That's fine. You're not gonna get in trouble for that." ECF 68, Doc #1 at 29:00. In its memorandum opinion, the Court found this to be the subjective opinion of the FBI, and not a binding promise on the government. But if the subjective opinion of the FBI was that Amri did not deserve to "get in trouble" so long as he came clean, then certainly it would fall outside the guideline heartland to not only convict him but sentence him to incarceration. The FBI stated what common sense reflects, that this is not the type of case for which incarceration is appropriate, and U.S.S.G. § 5K2.0 is a mechanism to cure the irrational results occasioned by the guidelines in this case.

We also observe that to provide no departure would result in an incongruous circumstance where this defendant would be subject to a very high upward departure under the facts of this case, in which the defendant believed any risk from Qamar had dissipated 2 years earlier, and was at best speculative. By contrast, under the guidelines, a defendant who lied about an actual serial killer who was actively involved in serial killing (but not for terrorist purposes) would be subject to probationary guidelines under section 1001 because the terrorism enhancement would not apply. Such incongruent results are as irrational as they are unintended by the guidelines, and a departure is appropriate needed to cure this incongruity, as the guideline was plainly directed at those who support terrorism and whose false statements were made consistent with that support.

III.    Variances under Section 3553(a)

Counsel reincorporates all of the above arguments in support of a variance as an alternative to a departure. The aforestated departure provisions largely capture the relevant considerations under § 3553(a), with the exception of the need to avoid unwarranted sentencing disparities.

As a general matter, prosecutions related to false statements involving terrorism appear to often be used as a plea mechanism in borderline material support cases, or alternately involve a trial of an individual who makes the false statements in order to further an eventual terrorist ambition. There does not appear to be an analogous case where a statement was made in which the purpose of the statement was solely to protect a close friend by someone who was himself opposed to terrorist philosophy.

But even in the most analogous case to this one, involving a trial solely on false statements, the defendant plainly sympathized with terrorist objectives, and made the false statements as a result, and the ultimate outcome was a sentence of probation. In that case, the Court found that "the Defendant had expressed sympathy and admiration for individuals who 'fight' non-Muslims

as well as his belief in the establishment of Shariah law, all over the world including in Somalia." *See* Exhibit B, p. 12. He also "stated he wanted to get to the 'battlefield' in Somalia." *Id.* He was also involved in "sending a video regarding the permissibility of martyrdom operations." *Id.* However, the Court in that case, potentially influenced by and uncomfortable with the results occasioned by the enhancements, acquitted the defendant of the enhancement and convicted on the false statements. Thereafter, a sentencing of probation was imposed. *See* Exhibit C.

To conclude that Simpson merited a sentence of probation, but the instant case merits more would be to elevate the concept of form over function into a moral imperative. The sentencing guidelines are intended to be approximations, not an absolute moral commentary, as these two cases make clear. It would be unwarranted for Amri to receive a harsher sentence than Simpson, and we do not believe even the government would say that Amri's actual conduct was worse than Simpson's. Further, individuals who have committed actual terrorist activities and cooperated have received sentences of time served, and those have threatened to kill federal officials have received sentences of probation.[2] Under the totality of the circumstances, it would create unwarranted sentencing disparities to impose further incarceration beyond the week of jail already served by the defendant.

Conclusion

In considering the appropriate sentence, we would ask the Court to think about the fact that what happened in this case could easily happen to _any_ law abiding family member. If the FBI came to any person, who was unaware of their right to remain silent, how many of those people would voluntarily disclose criminal conduct of their family member when it would send them

---

[2] https://www.cbsnews.com/news/minnesota-judge-rehab-not-prison-isis-member/;
https://www.dailystar.com.lb/ArticlePrint.aspx?id=324281&mode=print;
https://www.mprnews.org/story/2016/03/08/khaalid-abdulkadir-mpls-man-pleads-guilty-to-threatening-agents-isis

20

prison for a decade?  If a mother of a drug dealer was unexpectedly asked by the FBI whether she knew any drug dealers, does she deserve to go to prison when she says no and tells her husband to also say no?  The FBI understood this quandary when they expressed to Amri that he would not get in trouble because he "believe[d] in [his] heart[] that you're doing the right thing."  They understood it would not be appropriate to impose this type of punishment on those who are unfortunate enough to love a problematic person.  Even though a family member may be completely law abiding, and always redirecting their loved one towards a law abiding life, when the FBI knocks, they become yet one more predictable person to suffer as a consequence of their criminal loved one.  As Amri explained, "its hard when you know someone and you can feel it in your heart that that person is really a good person and that he has just kind of warped viewpoints on a lot of things and I love the guy."  That is what happened in this case, when Amri selflessly tried to protect someone he loved at his own expense.  In light of the totality of the sentencing considerations before this court, we submit that further incarceration is not warranted in this case.

Respectfully Submitted,
 _/s/ John Zwerling_____
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2017 a copy of the foregoing was filed by ECF, which shall serve notice upon all parties.

  /s/ John Zwerling
Cary Citronberg
John Zwerling
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
jz@zwerling.com